**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| | ) | |
| **JANI MCDOUGAL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **09-40035-FDS** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

_____

**MEMORANDUM AND ORDER ON PLAINTIFF'S**
**MOTION TO REVERSE AND DEFENDANT'S MOTION TO AFFIRM THE DECISION**
**OF THE COMMISSIONER**

**SAYLOR, J.**

   This is an appeal of the final decision of the Commissioner of the Social Security

Administration denying an application for social security disability insurance ("SSDI") and

supplemental security income ("SSI") benefits.  Pursuant to Section 205(g) of the Social Security

Act, 42 U.S.C. §§ 405(g), plaintiff Jani McDougal appeals the denial of her application for SSDI

and SSI.  In that application, she alleged that she became disabled on October 1, 2006, after a

right leg and ankle injury rendered her unable to work.  She also submitted medical records

indicating that she suffers from obesity; chronic intermittent low back, cervical spine, and neck

pain; hidradenitis suppurativa; and helicobacter pylori ("H. pylori").  She now disputes the

Commissioner's holding that she is not "disabled" within the meaning of the Social Security Act.

Pending before the Court is McDougal's appeal and the Commissioner's motion to affirm. For the reasons stated below, the motion to affirm will be granted and the motion to reverse will be denied.

## I.      Background

The following is a summary of the relevant evidence in the administrative record.

### A.      Medical History

#### 1.      Leg, Knee, Ankle, and Back Pain

McDougal's original leg and ankle injury occurred in 2005, prior to her alleged disability onset date. (AR at 215). She fell off a step, contusing her left leg and twisting her right knee and ankle. (*Id.* at 2157, 217). The pain worsened over time, and in March 2006, Dr. Paula Carmichael concluded there was possibility of a partial tear of the dorsiflexors of the right foot. (*Id.* at 205). In November 2006, McDougal complained that her right knee would "pop" and occasionally give out; sometimes it would not bend. (*Id.* at 217). McDougal was referred for physical therapy, which she received during December 2006. (*Id.* at 218, 255).

When the physical therapy failed to resolve the pain in either McDougal's knee or ankle—which, according to her, had reached a 7 on a scale of 10—she was referred to orthopedics for further evaluation. (*Id.* at 215, 254). A January, 9, 2007 radiological exam revealed no acute abnormality in the right ankle. (*Id.* at 210). An MRI of her right knee revealed thinning of the cartilage of the patellar facets. (*Id.* at 215). A follow-up MRI of her right ankle was ordered to rule out any pronator tearing and chronic lateral compartment syndrome. (*Id.* at 267). On January 31, 2007, after reviewing the right ankle MRI, Physician's Assistant Jennifer Pixley noted that McDougal had continued ankle pain, peroneus brevis tendonitis, posterior tibial

tendinopathy, and chronic ATFL tear.  (*Id.*).  Even so, she had a full range of motion in her right ankle.  (*Id.*).  She was prescribed a heel lift, a short leg cast, and another course of physical therapy, which she received during February and March 2007.  *(Id.* at 267, 311, 347-48, 352, 362).

In March 2007, an MRI of McDougal's right ankle revealed findings consistent with ligamentous instability.  (*Id.* at 322).  In April, she had her leg cast removed and she was instructed to begin one month of pronounced physical therapy.  (*Id.* at 284).

On April 27, 2007, McDougal was examined by Dr. John S. Stevenson following a referral by Dr. Carmichael.  (*Id.* at 281).  Dr. Stevenson noted that her pain had worsened rather than improved through the physical therapy, and that her pain was not relieved even though she was taking six to seven hydrocodone tablets a day as well as anti-inflammatories.  (*Id.*).  She expressed frustration at being out of work for over one year due to her ankle pain.  (*Id.*).  Dr. Stevenson sought a surgical consultation with Dr. Gary Peters, who agreed to see McDougal even though he was not convinced, at that time, that surgery would help.  (*Id.*).

During April and May 2007, McDougal participated in four physical therapy sessions for the pain in her right ankle.  (*Id.* at 278).  She was discharged from physical therapy on May 15, 2007, after her providers concluded that her goals had not been met.  (*Id.*).  As noted by Dr. Stevenson, she had continued to experience pain with no improvement, pain that reached as high as 9 on a scale of 10.  (*Id.*).

The next day, May 16, 2007, McDougal met with Dr. Peters.  (*Id.* at 277).  McDougal reported right lower extremity pain and numbness, which had resulted in a number of other symptoms including some low back and right hip pain.  (*Id.*).  Upon examination, Dr. Peters noted

a good range of motion in her right ankle.  (*Id.*).  Dr. Peters informed McDougal that he was not

sure of the exact cause of her symptoms because they did not appear to be consistent with a

primary ankle problem.  (*Id.*).  Dr. Peters did not believe surgery was indicated, and he instead

ordered an MRI of the lumbar spine.  (*Id.*).  That MRI was performed on May 18, 2007, and

revealed changes of facet arthopathy resulting in some degree of neurocompromise, which was

possibly related to a bulging disc at L4-L5.  (*Id.* at 267, 295).  Accordingly, Dr. Peters referred

McDougal to Dr. Mark Kaplan of the spine clinic.  (*Id.* at 276).

Dr. Kaplan examined McDougal on June 29, 2007.  (*Id.* at 297).  He concluded that she

was independent in her activities of daily living, although she had a right ankle injury, facet

arthopathy, disc degeneration in her lumbar spine, and likely fibromyalgia.  (*Id.*).  He prescribed

Medrol, an anti-inflammatory drug, and ordered cervical spine x-rays.  (*Id.*).  Those x-rays did not

reveal a definite bone abnormality, but they did snow muscle spasm causing reversal of lordosis.

(*Id.* at 299).

In August 2007, McDougal presented to Nurse Practitioner Paula D. Sommers with

complaints of an increase in chronic neck pain, back spasms, intermittent headache, and tingling of

the tips of her fingers.  (*Id.* at 272).  NP Sommers prescribed Diazepam, a medication that is used

as a skeletal muscle relaxant.  (*Id.* at 273).  Later that month, McDougal returned to see NP

Sommers to review her pain contract.  (*Id.* at 264).[1]  At that time, she was taking hydrocodone up

to four times per day for her leg and back pain, although she noted that she was sometimes able to

go two days without taking any.  (*Id.*).

---

[1] A pain contract is an agreement between a patient and provider that, among other things, explains the
risks of narcotic medications and the importance of adhering to the prescribed amount of medication.  (AR at 264).

4

In November 2007, Dr. Carmichael noted that McDougal had spondylosis, facet arthopathy, disc bulging, and mild foraminal narrowing in her lumbar spine. (*Id.* at 384).  She reported to Dr. Carmichael that the pain was aggravated by bending, lifting, and walking, but was alleviated by lying down.  (*Id.*).  Dr. Carmichael recommended continuing McDougal on pain medications for the treatment of her ankle, knee, and back problems, and possibly more physical therapy in the future.  (*Id.*).  Follow-up examinations in December 2007 and March 2008 revealed little change.  (*Id.* at 378-82).

### 2. Obesity

McDougal's leg, knee, ankle, and back pain is exacerbated by her obesity.  (*See id.* at 297).  She is 5 feet, 1 inch tall, and she weighs approximately 230 pounds.  (*Id.* at 217, 303).  She has body mass index of 43.5, which qualifies as extreme obesity.  (*Id.* at 4).

### 3. Cysts/Hidradenitis suppurativa

In March 2006, Dr. Carmichael observed that McDougal had cysts and furuncles under the arms and in her groin area that were diagnosed as hidradenitis suppurativa.  (*Id.* at 203).[2]  She prescribed erythromycin.  (*Id.* at 204).  In June 2006, despite the treatment, McDougal continued to develop cysts, including under her right arm and in the pubic region.  (*Id.* at 201).  A June 12, 2006, visit with NP Sommers revealed an "extremely large area of erythema and swelling," for which she was prescribed Vicodin and Augmentin.  (*Id.* at 222-23).

McDougal saw Dr. Carmichael one week later, who noted that the medications had not helped and that she was continuing to develop cysts.  (*Id.* at 201).   Although Dr. Carmichael

---

[2] Hidadenitis suppurativa is "chronic suppurative folliculitis of apocrine sweat gland-bearing skin of the perianal, axillary, and genital areas or under the breasts, producing abscesses or sinuses with scarring." STEDMAN'S MEDICAL DICTIONARY 797 (26th ed. 1995).  A furuncle is "a localized pyogenic infection."  *Id.* at 696.

opined that she generally did not think of hidradenitis suppurative as a disabling condition, it might be in her case because the cysts under her arms were very painful and she was unable to perform work that required her to move her arms.  (*Id.* at 201-02).  McDougal reported to having lost two jobs because of difficulties performing them, due to the pain under her arms and as a result of continual need to seek treatment for the cysts.  (*Id.* at 201).  On June 26, 2006, Dr. John R. Person, who examined McDougal following a referral by Dr. Carmichael, noted that she had had thirty to forty cysts excised over a period of time.  (*Id.* at 221).

In August 2006, McDougal was examined by Dr. Praneetha Narahari for treatment of hidradenitis in the groin.  (*Id.* at 219-20).  Dr. Narahari noted an infected and painful cyst, which had grown from being pea-sized to walnut-sized.  (*Id.* at 219).  Dr. Narahari drained the cyst and prescribed Vicodin for the pain.  (*Id.* at 220).  In March 2007, McDougal presented to NP Sommers with complaints of a rash on her left groin and cysts that she developed on the peri-area, in the groin area, and under the right arm.  (*Id.* at 266).  In April 2007, Dr. Carmichael again referred McDougal to Dr. Narahari for treatment of an infected cyst.  (*Id.* at 282).  Dr. Narahari drained the hidradenitis, and directed her to continue on the Vicodin as needed for the pain.  (*Id.*).  In December 2007, Dr. Carmichael noted no cysts or furuncles under her arms or in her groin area.  (*Id.* at 38).

**4        Abdominal Pain/Helicobacter pylori**

On July 25, 2007, McDougal was seen by NP Sommers after complaints of frequent bowel movements up to eight times a day for the previous six weeks.  (*Id.* at 272).  NP Sommers reported hyper-active bowel sounds and lower-left quadrant tenderness, and she diagnosed

McDougal with diverticulitis and prescribed Cipro.  (*Id.* at 272-73).[3]  On August 1, 2007, she was again examined by NP Sommers following complaints of abdominal pain.  (*Id.* at 270).  She reported nausea, abdominal pain, and diarrhea.  (*Id.*).  NP Sommers referred McDougal to gastroenterology for a colonoscopy.  (*Id.* at 271).  The subsequent colonoscopy revealed focally hyperplastic colonic mucosa, but no evidence of colitis.  (*Id.* at 315).  On August 21, 2007, she reported to be feeling better even though she was still having loose stools.  (*Id.* at 265).

In October 2007, as McDougal continued to have chronic intermittent abdominal pain, diarrhea, and nausea, she saw Dr. Michael Papper for an upper endoscopy with biopsy.  (*Id.* at 313).  The subsequent lab analysis of the biopsy was positive for H. pylori, a bacteria that causes gastritis and pyloric ulcers.  (*Id.* at 312).[4]

In November 2007, McDougal continued to complain of chronic and worsening abdominal pain, cramping, and bloating accompanied by fecal urgency, which awoke her two to three times per night.  (*Id.* at 383).  She reported that she was afraid to leave the house for fear that she would have to run to the bathroom.  (*Id.*).  To treat the H. pylori, Dr. Carmichael prescribed Flagyl, Biaxin, and Omeprazole.  (*Id.* at 384).[5]  As of December 2007, McDougal's abdominal pain still had not abated.  (*Id.* at 380).

---

[3] Cipro is "a synthetic fluoroquinolone broad spectrum, antibacterial with activity against a wide range of Gram-negative and Gram-positive organisms."  STEDMAN'S MEDICAL DICTIONARY at 342.

[4] H. pylori is a species of bacteria "that produces urease and is associated with several gastroduodenal diseases including gastritis and gastric, duodenal, and peptic ulcers."  STEDMAN'S MEDICAL DICTIONARY at 768.

[5] Flagyl, or metronidazole, is "an orally effective trichomonicide used in the treatment of infections caused by *Trichomonas vaginalis* and *Entamoeba histolytica*."  STEDMAN'S MEDICAL DICTIONARY at 1109.  Biaxin, or clarithromycin, is "used to treat many different types of bacterial infections affecting the skin and respiratory system.  It is also used together with other medicines to treat stomach ulcers caused by Helicobacter pylori."  *See* Drug Information Online, Biaxin, http://www.drugs.com/biaxin.html (last visited on March 30, 2010).  Omeprazole is a "drug which blocks the transport of hydrogen ions into the stomach and is used as an antiulcerative."  STEDMAN'S MEDICAL DICTIONARY at 1245.

On February 4, 2008, Dr. Papper performed a further upper endoscopy in order to further assess her chronic diarrheal symptoms and to rule out small bowel pathology. (*Id.* at 309). The endoscopy revealed a normal small bowel study, and Dr. Papper concluded that her symptoms most likely represented function diarrhea. (*Id.*).

On March 28, 2008, McDougal complained that abdominal pain would awaken her during the night. (*Id.* at 378). A physical examination revealed soft bowel sounds, no organomegaly or masses, no bruits, and mild tenderness. (*Id.*).[6] On November 30, 2007, McDougal informed Dr. Carmichael that she continued to have abdominal pain, and she reported no change in her bowl habits. (*Id.* at 380). Dr. Carmichael noted that her H. pylori ulcer had been treated in October 2007, but was still no better. (*Id.* at 382).

**5        Dr. Carmichael's Residual Functional Capacity Assessment**

Dr. Carmichael, McDougal's primary treating physician, completed an evaluation form on November 8, 2007. (*Id.* at 302-06). She also responded to interrogatories from the ALJ on June 21, 2008. (*Id.* at 385-87). In the November 2007 report, Dr. Carmichael identified McDougal's abdominal pain, diarrhea and H. pylori, as well as her chronic back pain. (*Id.* at 302). She noted that as a result of these conditions, McDougal had difficulty walking and that her daily activities were limited. (*Id.* at 304-05). McDougal could not do her own laundry and shopping was difficult. (*Id.* at 305). Dr. Carmichael noted that she would frequently be interrupted by the need to use the bathroom. (*Id.* at 304). In the June 2008 response to interrogatories, Dr. Carmichael concluded that McDougal could sit or stand for two hours at a time during an eight-hour workday, if she had breaks to lie down. (*Id.* at 386). She opined that lifting should be limited to

---

[6] A bruit, in this context, is an abnormal sound. STEDMAN'S MEDICAL DICTIONARY at 246.

only five pounds frequently and ten pounds occasionally. (*Id.*). Dr. Carmichael's opinions were based 80% on McDougal's subjective complaints and 20% on objective clinical, laboratory, and radiology findings. (*Id.* at 387). Dr. Carmichael's response to the interrogatories did not list H. pylori as one of the specific impairments for which she treated McDougal. (*Id.* at 385).

### B.      Procedural Background

McDougal applied for SSDI and SSI benefits on March 15, 2007, alleging that she became disabled on October 1, 2006. (*Id.* at 93, 100). The Commissioner denied her application both on initial review and after review by a federal reviewing official. (*Id.* at 44, 45, 46-54). McDougal requested an administrative hearing, which was held on May 23, 2008. (*Id.* at 18-43). Both McDougal, who was represented by counsel, and a vocational expert testified.

The ALJ issued his decision on October 1, 2008, concluding that McDougal was not disabled. (*Id.* at 7-17). On December 15, 2008, the Decision Review Board affirmed the ALJ's decision, even though it concluded that the ALJ erred in portions of his analysis. (*Id.* at 1-6). Having exhausted her administrative remedies, McDougal filed this complaint on February 10, 2009. *See* 20 C.F.R. § 405.420(b)(2).

## II.     Analysis

### A.      Standard of Review

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the

ALJ.  It does not fall on the reviewing Court." *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001)

(citation omitted); *see Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 143 (1st

Cir. 1987).  Therefore, "[j]udicial review of a Social Security Claim is limited to determining

whether the [Commissioner] used the proper legal standards, and found facts based on the proper

quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*.  *Seavey*,

276 F.3d at 9.

### B.    Standard for Entitlement to SSDI and SSI Benefits

An individual is not entitled to SSDI or SSI benefits unless she is "disabled" within the

meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(A), (d) (setting forth the

definition of disabled in the context of SSDI); *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the context

of SSI).  "Disability" is defined, in relevant part, as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment

must be severe enough to prevent the plaintiff from performing not only past work, but any

substantial gainful work existing in the national economy.  42 U.S.C. §§ 423(d)(2)(A),

1382c(a)(3)(B); 20 C.F.R. §§ 404.1560(c)(1), 416.960(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a

claimant is disabled.  *See* 20 C.F.R. § 404.1520.  The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is
> denied; 2) if the applicant does not have, or has not had . . . a severe impairment or
> combination of impairments, the application is denied; 3) if the impairment meets the
> conditions for one of the 'listed impairments' in the Social Security regulations, then

the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).[7]  "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the Commissioner at step five to "com[e] forward with evidence of specific jobs in the national economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir. 2001).  At that juncture, the ALJ assesses the claimant's RFC in combination with the "vocational factors of [the claimant's] age, education, and work experience," 20 C.F.R. § 404.1560(c)(1), to determine whether he or she can "engage in any . . . kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).        **C.      The Administrative Law Judge's Findings**

        In evaluating the evidence, the ALJ followed the five-step procedure set forth in 20 C.F.R. § 404.1520(a)(4), but concluded that it was unnecessary to proceed past step four.  (AR at 12-16).

        At the first step, he expressly found that McDougal had not engaged in substantial gainful activity since October 1, 2006, her alleged disability onset date.  (AR 12).

───────────────

        [7] "All five steps are not applied to every applicant, as the determination may be concluded at any step along the process."  *Seavey*, 276 F.3d at 5.

At the second step, the ALJ addressed the severity of McDougal's impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).  He concluded that she had the following severe impairments:  right knee, calf, and ankle abnormalities; intermittent low back, cervical spine, and neck pain; and obesity.  (AR at 12).  By contrast, he concluded that neither her hidradenitis suppurativa nor her H. pylori constituted severe impairments, because they had not continued, uninterrupted for "12 or more months."  *See id.* § 404.1509 ("Unless . . . impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months").

At the third step, the ALJ determined that McDougal's severe impairments did not meet the requirements of a Listed Impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1.  (AR at 13).

The ALJ then proceeded to the fourth step, considering McDougal's "residual functional capacity and [her] past relevant work."  20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ canvassed the evidence and reviewed McDougal's hearing testimony.  (AR at 13-16).  He noted her leg, ankle, back, and neck pain, her obesity, as well as her abdominal cramping, frequent bowel movements, and diagnosis of H. pylori.  (*Id.* at 14, 15).  He acknowledged Dr. Carmichael's residual functional capacity assessment and her responses to interrogatories, in which she opined that in an eight-hour workday, McDougal could sit or stand for eight hours with the need to take breaks and lie down, walk one mile, and lift and carry five pounds frequently and ten pounds occasionally.  (*Id.* at 15).  Dr. Carmichael's opinion, the ALJ noted, was based 80% on McDougal's subjective complaints and 20% on objective clinical, laboratory, and radiology findings.  (*Id.*).

After reviewing this evidence, the ALJ concluded that McDougal's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (*Id.* at 16). However, he found only "somewhat credible" McDougal's statements concerning the intensity, persistence, and limiting effect of these symptoms. (*Id.*). He noted that the complaints of abdominal cramping and bowel movements had not continued for a period of 12 or more months, and that no specific medications had been prescribed. (*Id.*). Regarding her complaints of leg, ankle, back, and neck pain, the ALJ found that a limitation to sedentary work with a sit-stand option was reasonable. (*Id.*).

Accordingly, the ALJ concluded that she had "the residual functional capacity to perform sedentary work, except that she requires the option to sit or stand as needed" and that "she cannot tolerate concentrated exposure to probable skin irritants." *See also* 20 C.F.R. §§ 404.1567(a), 416.967(a) (defining sedentary work). The residual functional capacity assessment did not include Dr. Carmichael's limitation that McDougal needed to take breaks and lie down.

Comparing McDougal's residual functional capacity to her past relevant work, the ALJ relied on the testimony of the vocational expert. (*Id.*). The ALJ found, consistent with the vocational expert's opinion, that McDougal could perform her past work as a secretary, both as she actually performed it and as it is generally performed. (*Id.*).[8] Because McDougal had a residual functional capacity to perform her past relevant work, the ALJ concluded that she was not disabled. (*Id.*).

---

[8] The ALJ acknowledged, however, that no significant number of jobs existed which would accommodate McDougal's subjective belief that she needed to elevate her lower extremities. (AR at 16). But he concluded that the treatment notes of McDougal's physicians did not support such a requirement. (*Id.*). McDougal does not challenge this finding on appeal.

D.     **The Review Board's Decision**

McDougal appealed the ALJ's findings to the Decision Review Board.  (AR at 1-8).  The Board agreed with the ALJ's findings under steps 1, 2, 3, and 4 of the sequential evaluation, particularly that she was capable of performing her past relevant work.  (*Id.* at 4).  Concluding, however, that the ALJ had failed to sufficiently account for McDougal's obesity, the Board classified McDougal as being "extremely" obese.  (*Id.* at 5).  It nonetheless concluded that the ALJ's residual functional capacity analysis would accommodate any limitations resulting from obesity.  (*Id.*).

The Board also concluded that the ALJ failed to properly consider McDougal's bowel impairment, and disagreed with his conclusion that the treatment notes did not document the frequency of McDougal's potential work interruptions due to her bowel impairment.  (*Id.*).  Even so, the Board concurred with the ALJ's determination that she did not have a "severe" bowel impairment because it did not limit her ability to perform basic work-related activities for a continuous period of at least 12 consecutive months.  (*Id.*).

As to credibility, the Board agreed with the ALJ's treatment of McDougals' subjective complaints of pain.  (*Id.*).  In all other material respects, the Board adopted and affirmed that ALJ's decision.

E.     **Plaintiff's Objections**

McDougal raises three objections before this Court.  She contends that the ALJ erred (1) in finding that her hidradenitis suppurativa and H. pylori are not severe; (2) in concluding that her

claims of disabling pain were not credible; and (3) in conducting his residual functional capacity assessment.  (Pl.'s Mem. at 13-15).  The Court will address each contention in turn.[9]

### 1.  Severity of Impairments

McDougal first challenges the ALJ's analysis of the severity of her impairments.  (Pl.'s Mem. at 13-14).  In particular, she contends that the ALJ erred in finding that her hidradenitis suppurativa and H. pylori do not qualify as severe impairments.  (*Id.*).  The Commissioner contends that neither condition lasted or could be expected to last twelve months or longer, and therefore did not qualify as severe impairments.  (Def.'s Mem. at 11).

Step two of the sequential evaluation process requires the Commissioner to determine whether a claimant possesses a "severe" impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment of combination of impairments is "severe" if it significantly limits an individual's ability to perform basic work activities and is expected to last twelve months or longer or result in death.  *Id.*  Moreover, as the Commissioner correctly notes, "statements [by a claimant] about . . . pain or other symptoms will not alone establish that [she] are disabled; there must be medical signs and laboratory findings which show that [a claimant] ha[s] a medical impairment(s)."  20 C.F.R. §§ 404.1529(a), 416.920(a).

The ALJ's finding that McDougal's H. pylori was did not meet the durational requirement is supported by substantial evidence.  McDougal correctly notes that she first reported abdominal pain in July 2007, that she received a diagnosis of H. pylori in October 2007, and that she reiterated her complaints about pain at the administrative hearing in May 2008.  (AR at 27-28,

---

[9] Where the Board disagreed with the ALJ, the Board's rationale controls.  To the extent the Board adopted the ALJ's findings, the ALJ's findings qualify as the final decision of the Commissioner.  *See* 20 C.F.R. § 405.420(b)(2).

272, 312).  Even so, Dr. Papper performed a endoscopy in February 2008, which revealed a normal bowel study.  (*Id.* at 309).  It was Dr. Papper's opinion that McDougal's symptoms most likely reflected functional diarrhea, which supports the Commissioner's contention that McDougal's gastroenterology symptoms did not place a disabling limit on her ability that would be expected to last for the required twelve months.  (*Id.*).[10]  This conclusion finds further support in Dr. Carmichael's failure to list McDougal's abdominal pain as a specific impairment when she responded to the ALJ's interrogatories.  (*Id.* at 385).  At the very least, this calls into doubt McDougal's contention that H. pylori was disabling.  Substantial evidence therefore supports the ALJ's decision that McDougal's H. pylori was not a severe impairment.

The ALJ's finding that McDougal's hidradenitis suppurativa was not a "severe" impairment is also supported by substantial evidence.  Although the cysts were evident and produced pain in March 2006, by April 2007, McDougal was experiencing problems only "on and off."  (AR at 203, 282).  And by November 2007, Dr. Carmichael noted that McDougal did not have any visible cysts or furuncles.  (*Id.* at 380).  Moreover, Dr. Carmichael opined that she generally did not think of hidradenitis suppurative as a disabling condition.  (*Id.* at 201-02).  Although Dr. Carmichael also stated that "if [McDougal] is continuously generating painful cysts as she described, I can imagine that in her case it might in fact be [disabling]," by November 2007, it was clear that she was not "continuously" developing pain cysts.  (*Id.* at 202, 380).  Accordingly, the ALJ did not err in finding that McDougal's hidradenitis suppurativa did not satisfy the durational element of the severe impairment definition.

---

[10] McDougal testified that although H. pylori is treated with antibiotics, she was allergic to the three types of antibiotics her doctors prescribed.  (AR at 27).  These allergies are not evident in the record, however, because Dr. Carmichael speculated late as November 2007 that a second round of antibiotics might be in order.  (*Id.* at 382).

2.   **Credibility**

McDougal further contends that the ALJ erred in concluding that her claims of debilitating pain were not credible.  (Pl.'s Mem. at 14-15).  McDougal argues that the ALJ's finding was inconsistent with the criteria for determining credibility.  (*Id.* at 14).  The Commissioner responds that the ALJ properly analyzed McDougal's credibility, and that his decision is supported by substantial evidence.

As a general matter, "[t]he credibility determination by the ALJ, who observed the claimant, evaluated h[er] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference. . . ."  *Frustaglia v. Sec'y of Health & Human Servs.*, 829 F.2d 192, 195 (1st Cir. 1987).  In assessing a plaintiff's subjective complaints of pain, the ALJ examines, as relevant, a number of factors, including:  a plaintiff's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medications; treatment, other than medication, the plaintiff receives or has received for relief of the pain; any measures the plaintiff has taken to relieve the pain; and any other factors concerning the functional limitations and restrictions due to the pain.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see Avery v. Sec'y of Health & Human Servs.,* 797 F.2d 19, 23 (1st Cir. 1987).

At the outset, it bears emphasis that the ALJ did not entirely discredit McDougal's assertions of pain.  (AR at 16).  Rather, he found them to be "somewhat credible."  (*Id.*).  In reaching that conclusion, the ALJ considered the above factors, and the Court concludes that his credibility finding was supported by substantial evidence.  McDougal lives on the third-floor of her building and goes up and down the three flights of stairs, which suggests

that the pain is not disabling.  (AR at 15).  Dr. Kaplan noted that she was independent in her daily

activities.  (*Id.* at 297).  Moreover, although McDougal has been prescribed pain medication, at

times she is able to go up to two days without taking any.  (*Id.* at 9, 264).  And while she reported

that her pain reached as high as 9 or 10 out of 10, it was much lower at rest.  (*Id.* at 352).  The

treatment of her ankle injury in particular was conservative, relying principally on physical

therapy, and her doctors agreed that a surgical procedure was not indicated.  (*Id.* at 277).  She

does not appear to have received pain injections.  (*Id.* at 297).  Finally, while the cysts are painful

when present, by November 2007, it appeared the hidradenitis suppurativa was under control, as

Dr. Carmichael noted that McDougal did not have any visible cysts or furuncles.  (*Id.* at 380).  In

sum, the ALJ appropriately evaluated McDougal's credibility based on the record evidence.

### 3.     Residual Functional Capacity Assessment

Finally, McDougal argues that the ALJ failed to include her need to take breaks and lie

down in his residual function capacity assessment.  (Pl.'s Mem. at 15).  She contends that Dr.

Carmichael, her treating physician, included such a limitation in her assessment, but that the ALJ

ignored the limitation in finding that she had an residual function capacity for sedentary work.

(AR at 386).  In so ignoring the conclusions of her treating physician, McDougal argues that the

ALJ violated his duty to consider the opinions of a claimant's treating physicians.  *See* 20 C.F.R.

§§ 404.1527(d)(2), 416.927(d)(2).  The Commissioner responds that the ALJ's residual function

capacity assessment was appropriate because the record does not support McDougal's proposed

limitation.  (Def.'s Mem. at 15).

Under the applicable regulations, the ALJ will generally "give more weight to opinions

from [] treating sources, since these sources are likely to be the medical professionals most able to

provide a detailed, longitudinal picture of [a] medical impairment." *Id.* § 404.1527(d)(2); *see id.* § 416.927(d)(2) . If a treating physician's opinion is inconsistent or unsupported by the record, however, the ALJ will not give it significant weight. *See id.* §§ 404.1527(d)(4), 416.927(d)(4).

The Court concludes that the ALJ's decision is supported by substantial evidence. Dr. Carmichael's limitation—that McDougal needed to take breaks and lie down—does not have sufficient support in the record. (AR at 386). Indeed, the only piece of evidence to which McDougal points to support this limitation is Dr. Carmichael's November 2007 report stating that her back pain was alleviated by lying down. (*Id.* at 384). In that report, however, Dr. Carmichael did not conclude that the pain could be alleviated *only* by lying down. (*See id.*). Moreover, the ALJ concluded that McDougal's complaints of disabling pain were not entirely credible, a finding to which this Court has deferred. (*Id.* at 5, 16). Accordingly, because McDougal's claimed need to lie down does not have sufficient support in the record, the ALJ's decision not to include such a limitation in his residual functional capacity assessment is supported by substantial evidence and the ALJ did not err in declining to give more weight to Dr. Carmichael's opinion.[11]

## III.   Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse the final decision of the Commissioner of the Social Security Administration is DENIED, and defendant's motion to affirm the action of the Commissioner is GRANTED.

**So Ordered.**

---

[11] Plaintiff also presents a conclusory two-sentence argument that the ALJ erred in failing to include limitations caused by the cysts and H. pylori. (Pl.'s Mem. at 15). Having concluded that substantial evidence supports the conclusion that plaintiff's hidradenitis and H. pylori do not constitute severe impairments, the Court will not second-guess the ALJ's decision not to include a limitation based on those conditions.

19

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 31, 2010